ACCEPTED
15-25-00117-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 5:34 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00117-CV

# In the Court of Appeals
# for the Fifteenth Judicial District

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/27/2025 5:34:54 PM
CHRISTOPHER A. PRINE
Clerk

THE STATE OF TEXAS,

*Appellant/Cross-Appellee,*

*v.*

PATRICK COX, FOR HIMSELF AND AS AGENT FOR AOC RANCHES, LLC; TEAM ADVERTISING SERVICES, INC.; CCLHR ENTERPRISES, LLC; AND VPIZZA RESTAURANT 001, LLC,

*Appellees/Cross-Appellants,*

On Appeal from the
419th Judicial District Court, Travis County
No. D-1-GN-19-000436

## BRIEF FOR APPELLANT

| | |
|---|---|
| KEN PAXTON<br>Attorney General of Texas | WILLIAM R. PETERSON<br>Solicitor General |
| BRENT WEBSTER<br>First Assistant Attorney General | JACOB C. BEACH<br>Assistant Solicitor General<br>State Bar No. 24116083<br>Jacob.Beach@oag.texas.gov |
| Office of the Attorney General<br>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-1700<br>Fax: (512) 474-2697 | ALI THORBURN<br>Assistant Attorney General |
| | Counsel for Appellant |

**ORAL ARGUMENT REQUESTED**

# Identity of Parties and Counsel

**Appellant:**
The State of Texas

**Appellate and Trial Counsel for Appellant:**
Ken Paxton
Brent Webster
William R. Peterson
Jacob C. Beach (lead counsel)
Ali Thorburn
Cole P. Wilson

Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-6407
Jacob.Beach@oag.texas.gov

**Appellees:**
Patrick Cox, for himself and as agent for AOC Ranches, LLC; Team Advertising Services, Inc.; CCLHR Enterprises, LLC; and VPizza Restaurant 001, LLC

**Appellate and Trial Counsel for Appellees:**
Reese Baker
Baker & Associates
950 Echo Ln Ste 300
Houston, TX 77024-2824
(713) 979-2251
Reese.Baker@bakerassociates.net

# Table of Contents

Page

Identity of Parties and Counsel ....................................................................... i

Index of Authorities ...................................................................................... iv

Statement of the Case .................................................................................... ix

Statement Regarding Oral Argument.............................................................. ix

Issues Presented............................................................................................. x

Introduction ................................................................................................... 1

Statement of Facts .......................................................................................... 2

    I.   A Jury Finds Cox Liable for $46 million in DTPA Violations. ................... 2

    II.  The Court-Appointed Receiver Enforces Judgment. ........................... 3

        A.  Cox fails to post bond despite court warnings. ..................................... 3

        B.  The court-appointed receiver enforces judgment. ............................... 5

        C.  The court approves the Corporate Compromise agreement................ 7

    III. Cox Receives His Assets Back Through the Bankruptcy Process.............. 8

        A.  The appeals court reverses as to Cox's personal liability..................... 8

        B.  Cox receives his assets back. ............................................................. 9

    IV. Cox Sues the State for $20 Million.......................................................... 10

        A.  Cox claims the state took and converted his property........................ 10

        B.  Cox misleads the district court about the facts. ................................. 11

Summary of the Argument.............................................................................. 14

Standard of Review ........................................................................................ 15

Argument ....................................................................................................... 15

    I.   Cox Did Not Bring His Claims Within the Limitations Period.................. 15

    II.  Cox Lacks Standing Because He Received His Assets Back...................... 17

        A.  Cox fails to present evidence about harm to the entities.................... 18

        B.  Cox was made whole......................................................................... 20

        C.  Any purported harms were self-inflicted. .......................................... 21

III. Sovereign Immunity Categorically Bars Cox's Conversion, Restitution, and Due Course of Law Claims..............................................26

    A. The Legislature retains immunity for conversion claims. ..................26

    B. Restitution is retrospective monetary damages.................................27

    C. *Reata* abrogation does not apply where Cox initiated suit..................28

    D. Cox cannot seek damages for his Due Course of Law claim. ..............31

IV. Cox's Takings Claim is Facially Invalid......................................................36

    A. Texas neither took nor received any assets. ......................................36

    B. The record negates any claim of intent. ............................................38

Prayer...........................................................................................................41

Certificate of Compliance .............................................................................41

# Index of Authorities

Page(s)

**Cases:**

*1st & Trinity Super Majority, LLC v. Milligan,*
657 S.W.3d 349 (Tex. App.—El Paso 2022) ....................................................... 38

*Abbott v. Mexican Am. Legis. Caucus,*
647 S.W.3d 681 (Tex. 2022) ...................................................................... 18, 40

*AFLOA, LLC v. Tex. Dep't of Motor Vehicles,*
2025 WL 209447 (Tex. App.—15th Dist. Jan. 16, 2025, no pet.) ................ 31, 33

*Andrade v. NAACP of Austin,*
345 S.W.3d 1 (Tex. 2011) ............................................................................ 36

*B. Gregg Price, P.C. v. Series 1 - Virage Master LP,*
661 S.W.3d 419 (Tex. 2023) ...................................................................... 32, 33

*Chambers-Liberty Cntys. Navigation Dist. v. Texas,*
575 S.W.3d 339 (Tex. 2019) ...................................................................... 28, 32

*City of Baytown v. Schrock,*
645 S.W.3d 174 (Tex. 2022) ............................................................................ 25

*City of Beaumont v. Bouillion,*
896 S.W.2d 143 (Tex. 1995) ............................................................................ 32

*City of Dallas v. Jennings,*
142 S.W.3d 310 (Tex. 2004) ............................................................................ 40

*City of El Paso v. Heinrich,*
284 S.W.3d 366 (Tex. 2009) ............................................................................ 28

*City of Houston v. Carlson,*
451 S.W.3d 828 (Tex. 2014) ............................................................................ 36

*City of Port Arthur v. Thomas,*
659 S.W.3d 96 (Tex. App.—Beaumont 2022, no pet.) ...................................... 32

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ...................................................................................... 21

*Clements v. Barnes,*
834 S.W.2d 45 (Tex. 1992) ............................................................................ 38

*Columbia Rio Grande Healthcare, L.P. v. Hawley,*
284 S.W.3d 851 (Tex. 2009) ............................................................................ 25

*Cox v. State,*
448 S.W.3d 497 (Tex. App.—Amarillo 2014, pet. denied) .............................. 2, 8

*Cox v. State*,
  2013 WL 609243 (Tex. App.—Amarillo Feb. 14, 2013, no pet.) .................. 4, 22

*Cox v. State*,
  No. 18-CV-0409 (405th Dist. Ct., Galveston County 2018) ............................ 10

*In re Cox*,
  2013 WL 692435 (Tex. App.—Austin Feb. 15, 2013, no pet.) ...................... 4, 22

*In re Cox*,
  2017 WL 1058263 (Bankr. S.D. Tex. Mar. 20, 2017) ............................................ 8

*In re Crow-Billingsley Air Park, Ltd.*,
  98 S.W.3d 178 (Tex. 2003) ................................................................................ 22

*Ctr. for Biological Diversity v. United States Env't Prot. Agency*,
  937 F.3d 533 (5th Cir. 2019) ............................................................................. 21

*Curadev Pharma Pvt. Ltd. v. Univ. of Tex. Sw. Med. Ctr.*,
  2025 WL 2414661 (Tex. App.—15th Dist. 2025, no pet. h.) ....... 27, 36, 37, 38, 39

*Dallas Area Rapid Transit v. Whitley*,
  104 S.W.3d 540 (Tex. 2003) ...............................................................................15

*Daves v. Dallas County, Tex.*,
  22 F.4th 522 (5th Cir. 2022) (en banc) ............................................................. 24

*Denver City Indep. Sch. Dist. v. Moses*,
  51 S.W.3d 386 (Tex. App.–Amarillo 2001, no pet.) .......................................... 28

*Elledge v. Friberg-Cooper Water Supply Corp.*,
  240 S.W.3d 869 (Tex. 2007)................................................................................16

*Eriksen v. Nelson*,
  708 S.W.3d 302 (Tex. App.—15th Dist. 2025, no pet.) ............................... 15, 35

*Farmers Tex. Cnty. Mut. Ins. v. Beasley*,
  598 S.W.3d 237 (Tex. 2020) .............................................................................. 18

*Green v. Tex. Comptroller of Pub. Accts.*,
  697 S.W.3d 305 (Tex. App.—El Paso 2023, pet. reh'g filed)............................ 24

*Ex parte Griffitts*,
  711 S.W.2d 225 (Tex. 1986) .............................................................................. 38

*Gulf Coast Ctr. v. Curry*,
  658 S.W.3d 281 (Tex. 2022) .............................................................................. 26

*Ex parte Halprin*,
  708 S.W.3d 1 (Tex. Crim. App. 2024) ............................................................... 34

*Harris Cnty. Flood Control Dist. v. Kerr*,
  499 S.W.3d 793 (Tex. 2016)............................................................................... 40

*Ex parte Hodges*,
625 S.W.2d 304 (Tex. 1981)......................................................38

*Houston v. Renault, Inc.*,
431 S.W.2d 322 (Tex. 1968)......................................................40

*Klumb v. Hous. Mun. Emps. Pension Sys.*,
458 S.W.3d 1 (Tex. 2015)....................................................33, 36

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..................................................................18

*Mendell v. Scott*,
2022 WL 2951666 (Tex. App.–Houston [1st] 2022, pet. denied).....................19

*Miga v. Jensen*,
299 S.W.3d 98 (Tex. 2009)........................................................28

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................................................................21

*Nazari v. Texas*,
561 S.W.3d 495 (Tex. 2018)..........................................29, 30, 39

*Nelson v. Colorado*,
581 U.S. 128 (2017)............................................................34, 35

*In re Nestle USA, Inc.*,
359 S.W.3d 207 (Tex. 2012)......................................................28

*Pollard v. Hanschen*,
315 S.W.3d 636 (Tex. App.—Dallas 2010, no pet.)............................16

*Poole v. W. Hardin Cnty. Consol. Indep. Sch. Dist.*,
385 S.W.3d 52 (Tex. App.—Beaumont 2011)................................32

*Prairie View A&M Univ. v. Chatha*,
381 S.W.3d 500 (Tex. 2012)......................................................15

*Ramos v. Dunbar*,
2025 WL 543113 (Tex. App. —15th Dist. Jan. 14, 2025, no pet.)............18

*Reata Constr. Corp. v. City of Dallas*,
197 S.W.3d 371 (Tex. 2006)......................14, 29, 30, 31, 35

*In re Sheshtawy*,
154 S.W.3d 114 (Tex. 2004)......................................................22

*State v. Holland*,
221 S.W.3d 639 (Tex. 2007)............................15, 38, 39, 40

*State v. Nonparty Patient No. 1*,
2025 WL 2355380 (Tex. App.—15th Dist. 2025, no pet. h.)................18

vi

*Stringfellow v. Texas Dep't of Pub. Safety*,
    2025 WL 996361 (Tex. App.–15th Dist. Apr. 3, 2025, pet. denied) ...................15

*In re TaxMasters, Inc.*,
    No. 12-32065 (Bankr. S.D. Tex. Mar. 18, 2012)........................................... 2-3

*Teal Trading & Dev., L.P. v. Champee Springs Ranches Prop. Owner's
    Ass'n*, 593 S.W.3d 324 (Tex. 2020)....................................................... 18

*Tex. Dep't of Pub. Safety v. Petta*,
    44 S.W.3d 575 (Tex. 2001) ................................................................... 27

*Tex. DOT v. Jones*,
    8 S.W.3d 636 (Tex. 1999)...................................................................... 26

*Tex. DOT v. Sefzik*,
    355 S.W.3d 618 (Tex. 2011) .................................................................. 33

*Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*,
    712 S.W.3d 943 (Tex. App.—15th Dist. 2025, no pet.).................................31

*Tex. State Univ. v. Tanner*,
    689 S.W.3d 292 (Tex. 2024)...................................................................15

*Texas Dep't of Parks & Wildlife v. Miranda*,
    133 S.W.3d 217 (Tex. 2004)...................................................................15

*In re Texas Educ. Agency*,
    619 S.W.3d 679 (Tex. 2021) .................................................................. 22

*In re TMIRS Enters., LTD*,
    No. 12-32062 (Bankr. S.D. Tex. Mar. 18, 2012) ........................................ 3

*In re Topcor, Inc.*,
    132 B.R. 119 (Bankr. N.D. Tex. 1991)....................................................17

*Town of Shady Shores v. Swanson*,
    590 S.W.3d 544 (Tex. 2019) .............................................................15, 26

*Williams v. Pennsylvania*,
    579 U.S. 1 (2016)................................................................................ 34

*Young v. Tex. Parks & Wildlife Dep't*,
    2025 WL 1200947 (Tex. App.—15th Dist. 2025, no pet. h.) ...................31, 33, 35

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2018)................................................................. 21

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:

amend. V ........................................................................................... 10

amend. XIV ...................................................................................... 10

Tex. Const.:

art. I, § 17 .............................................................................10, 26, 40

art. I, § 17(a)..................................................................................... 36

art. I, § 19 ............................................................................ 10, 26, 31

11 U.S.C. § 108............................................................................................17

Bankruptcy Code § 108(a) .........................................................................17

Tex. Civ. Prac. & Rem. Code:

§ 16.003...........................................................................................16

§ 16.003(a) ......................................................................................16

§ 34.047(b)...................................................................................... 24

§ 64.031........................................................................................... 37

§ 101.057 ........................................................................................ 27

§ 101.106 ........................................................................................ 27

Tex. Gov't Code § 311.034 .......................................................................15

Tex. R. Civ. P. 166a(c) ...............................................................................15

Texas Deceptive Trade Practices Act................................................... 2, 9

Texas Medicaid Fraud Prevention Act ................................................... 29

Texas Tort Claims Act............................................................................... 27

## STATEMENT OF THE CASE

*Nature of the Case*: Cox brings claims for damages resulting from the State's alleged role in enforcing a later-reversed judgment. Because it is brought against the State, the case presents a threshold question regarding sovereign immunity.

*Course of Proceedings*: In June 2012, a jury found Patrick Cox and two of his companies, TaxMasters, Inc. and TMIRS Enterprises, LTD, liable for 110,383 violations of the Texas Deceptive Trade Practices Act, totaling nearly $200 million in restitution and penalties. Of that amount, the Court ordered Cox personally to pay $46 million. The Court, after warning Cox of the consequence of his invalid bond, appointed a receiver to collect on the judgment, which it did. In July 2014, the Seventh Court of Appeals reversed the judgment as to Cox's personal liability.

On April 3, 2018, Cox sued the State seeking to recover over $20 million, alleged to be the value of the property collected by a court-appointed receiver. On April 25, 2025, the State filed a combined plea to the jurisdiction and motion for summary judgment asserting sovereign immunity. Following briefing, the district court held a hearing on June 11, 2025.

*Trial Court*: 419th Judicial District Court, Travis County
The Honorable Maya Guerra Gamble

*Trial Court Disposition*: On June 16, 2025, the district court granted the State's plea as to the federal causes of action and denied the plea as to Cox's claims for conversion, restitution, and violations of the Texas Constitution's takings and due course of law clauses.

## STATEMENT REGARDING ORAL ARGUMENT

Because this case involves a complicated background and procedural history, the State requests oral argument.

# Issues Presented

The issues presented are:

1. Whether the district court erred in permitting Cox's claims to proceed when they were filed years after the applicable statute of limitations ran.

2. Whether Cox has standing to sue the State when he ultimately received his assets back and any alleged harms were self-inflicted consequences of his own litigation choices.

3. Whether Cox's claims for conversion, restitution, and due course of law are categorically barred by sovereign immunity, which the Legislature has not waived, and which cannot be avoided by recasting retrospective monetary relief as equitable.

4. Whether Cox's takings claim is facially invalid where Texas never took or received his property, and the court-appointed receiver acted solely as an arm of the judiciary.

# INTRODUCTION

This case does not belong in court. Patrick Cox was found personally liable for nearly $46 million in penalties and restitution under the Deceptive Trade Practices Act. When he failed to post a valid supersedeas bond, the trial court appointed a receiver, who collected Cox's non-exempt property pursuant to court order. Two years later, the court of appeals reversed Cox's personal liability. By then, the Receiver had transferred the collected funds into the TaxMasters corporate bankruptcy, where Cox later recovered them through his own personal bankruptcy proceedings. At every step, Cox received notice, had an opportunity to object, and either consented or stood silent. He was ultimately made whole.

Nevertheless, Cox now sues the State for more than $20 million in damages, even though the State never possessed, retained, or benefitted from his assets. His claims rest on mischaracterizations of the record, such as suggesting that Texas controlled the court-appointed receiver or kept his money. They also rest on legal theories foreclosed by sovereign immunity, jurisdictional limits, and settled precedent. Cox's harms are self-inflicted and well past the limitations period. His common law claims are categorically barred by sovereign immunity. And his constitutional claims collapse on their face: The State neither took property for public use nor deprived him of due process when he had notice and a chance to be heard at every turn.

This suit is an impermissible attempt to hold Texas liable for money it never collected. The district court, proceeding on Cox's misrepresentations, wrongly allowed it to move forward. This Court should reverse and dismiss.

In June 2012, a trial court ordered Cox to personally pay $46,187,434 for violations of the Texas Deceptive Trade Practices Act ("DTPA"). After Cox refused to pay for a supersedeas bond and rejected the district court's offer to entertain a motion to lower the amount, the court appointed a receiver to collect Cox's non-exempt personal assets, which were liquidated and transferred to the corporate bankruptcy because of the pierced veil. The Seventh Court of Appeals later reversed the judgment as to Cox's personal liability. CR.97-111; *see generally Cox v. State*, 448 S.W.3d 497 (Tex. App.—Amarillo 2014, pet. denied). About two years after that, Cox declared personal bankruptcy and received back the entirety of the amount previously transferred to the corporate bankruptcy. Cox now claims the State owes him $20 million dollars.

## I.   A Jury Finds Cox Liable for $46 million in DTPA Violations.

In 2004, Cox established TMIRS Enterprises, Ltd. ("TMIRS"), a limited partnership that offered tax resolution services to clients. CR.98. Five years later, "[i]n 2009, Cox formed TaxMasters, Inc., which assumed the tax resolution business that was being conducted by TMIRS." *Id.* Cox owned TMIRS and was President, Chief Executive Officer, Chairman of the Board, and majority shareholder of TaxMasters, Inc. *Id.* TMIRS and TaxMasters, Inc. operated under the name "TaxMasters." *Id.*

In May 2010, the State filed a public enforcement action against TaxMasters, Inc., TMIRS, and Cox for DTPA violations. CR.99. Shortly before trial was set to begin, in March 2012, both companies filed for bankruptcy. *See In re TaxMasters,*

*Inc.*, No. 12-32065 (Bankr. S.D. Tex. Mar. 18, 2012); *In re TMIRS Enters., LTD*, No. 12-32062 (Bankr. S.D. Tex. Mar. 18, 2012).[1]

In June 2012, a jury found Cox and the two companies liable for 110,383 violations of the DTPA in the enforcement action. CR.68. Specifically, the jury found TaxMasters, Inc. committed 94,114 violations, TMIRS Enterprises, LTD committed 644 violations, and Cox individually committed 15,625 violations. *Id.* The jury found the defendants liable for nearly $200,000,000. CR.68, 71-73. Of that amount, Cox personally was ordered to pay $14,622,102 in restitution, $31,250,000 in civil penalties, and $315,332.67 in attorney's fees, totaling $46,187,434.67. CR.68-70. Cox appealed the judgment as it applied to him.

## II. The Court-Appointed Receiver Enforces Judgment.

### A. Cox fails to post bond despite court warnings.

In January 2013, the trial court entered an order granting turnover and appointing a receiver ("the Receiver") to execute the judgment. CR.81-94. To lower the supersedeas bond while the case was on appeal, Cox went to the district clerk's office and attempted to supersede the court's order by posting a $10 cash bond. CR.130-31. To aid this attempt, Cox filed a sworn affidavit valuing the property at issue *in this lawsuit*:

---

[1] The TaxMasters and TMIRS bankruptcies were consolidated under Case No. 12-32065 (jointly "TaxMasters Bankruptcy"). *See* Order, *In re TaxMasters, Inc.*, No. 12-32065 (Bankr. S.D. Tex. Feb. 6, 2014).

> 4. Based upon the Statement of Net Worth, I currently have a net worth of ($440,262.28), before considering any allowance for exempt property, and a net worth of ($548,418.29) after considering the value of my exempt property, net of any valid liens on the same. These net worth calculations do not include the judgment in the above-styled and numbered case or unliquidated and contingent matters identified in *Exhibit 1*.

CR.117; *see* CR.117-27. In response to Cox's filings, the District Clerk wrote to the district court judge about how to proceed. CR.130. The court replied that its orders always control. *Id.* The court then wrote the following letter to Cox's counsel:

> As for this court, if Mr. Cox wishes to pursue a motion to set a lower amount for the supersedeas, my office will provide a setting. However, setting such a motion is not an emergency other than one of Mr. Cox' own making. He has known since last November of my order setting the amount for a supersedeas. He has known that he has not provided security in that amount. Therefore, with the advice of counsel, he should have expected that collection efforts would ensue. Additionally, Mr. Cox must have known for some time of his alleged decrease in net worth, yet he did not act – by motion in this court or even by request of the District Clerk – to seek a lower supersedeas until last week.

CR.131.

Cox twice challenged the Receivership order in the district court and lost. CR.197. Cox also filed an "*Emergency Motion for Enforcement of Supersedeas Pending Hearing on Appellant's Motion for Review of Trial Court's Ruling on Supersedeas*" with the Seventh Court of Appeals and a petition for writ of mandamus with the Third Court of Appeals. *Id.* Both were denied. *See Cox v. State*, No. 07-12-00453-CV, 2013 WL 609243, at *1 (Tex. App.—Amarillo Feb. 14, 2013, no pet.) (per curiam) (emergency motion); *In re Cox*, No. 03-13-00095-CV, 2013 WL 692435, at *1 (Tex. App.—Austin Feb. 15, 2013, no pet.) (mem. op.).

## B.  The court-appointed receiver enforces judgment.

The court-appointed receiver collected Cox's non-exempt property for sale, including Cox's personal equity in several companies. CR.197, 222-23. The Receiver collected a total of $830,756, as follows:

| MONIES RECOVERED IN COX RECEIVERSHP | | |
|---|---|---|
| Payment from Cara Cox in exchange for jewelry[1]: | | $100,000 |
| Sale of AOC ranch property[2]: | | $430,730 |
| Sale of automobiles[3]: | | $175,600 |
| Panoz | $14,500 | |
| Porsche | $80,000 | |
| Ford Truck | $26,000 | |
| Mercedes | $38,000 | |
| Mazda Miatas | $ 4,550 | |
| Trailer | $ 6,550 | |
| Motorcycles/Miata | $ 6,000 | |
| Sale of Rolex watch[4]: | | $9,700 |
| Sale of firearms[5]: | | $13,200 |
| Sale of mobile home and contents: | | $20,000 |
| Cash from accounts/foreign currency: | | $24,880 |
| Janus Capital Group[6] | | $53,278 |
| Refund of insurance premium: | | $3,368 |
| TOTAL: | | $830,756 |

CR.225.

The Receiver received an offer to purchase the AOC ranch property for $771,000, rejected this offer, and countered with $850,000, which the buyer accepted. CR.484. The Receiver then filed a motion to approve sale of real property, *which Cox did not oppose*. CR.222, 229. The court granted the Receiver's motion. CR.229. The Receiver's inventory lists the Ranch as follows:

**REAL PROPERTY**

Approximately, 1,100 acres of property in Motley County, Texas and Hall County, Texas obtained by and through Receiver's exercise of control over Defendant Cox's ownership interest in AOC Hunting, LLC. This property was sold pursuant to Order of the Receivership Court, with notice to Mr. Cox, who did not oppose the sale. The net proceeds, after payment of all liens on the property, was $430,730

CR.222. The Receiver did not sell any of Cox's ownership interest in AOC Ranch, LLC, Team Advertising Services, Inc., CCLHR Enterprises, LLC, or VPizza Restaurant 001, LLC (the "Entities"). CR.222-23, 243-44. After selling the assets, the Receiver distributed all monies:

| DISTRIBUTION OF MONIES FROM RECEIVERSHIP | |
| --- | --- |
| Total monies in receivership account: | $830,756 |
| Monies returned to Patrick Cox: | ($ 50,816) |
| Monies returned to TMIRS Enterprises[1]: | ($ 496) |
| Expenses reimbursed to Receiver: | ($ 32,502) |
| Net amount available to distribute: | ($746,942) |
| Receivership fee of 25% of net proceeds[2]: | ($186,736) |
| Amount distributed as directed by the State[3]: | $560,207 |
| Balance in receivership account: | $0 |

6

CR.227. The Receiver noted that the State "directed" $560,207 of all monies collected, but also explained that: (a) all distributions were made pursuant to a court order "after notice to Cox and all interested parties, and [a] hearing;" and (b) the funds were "deposited into a segregated account … controlled by the [bankruptcy] trustee," as explained further below. *Id.*

### C. The court approves the Corporate Compromise agreement.

In May 2013, the TaxMasters Bankruptcy trustee and the Receiver jointly moved to create a compromise account in the TaxMasters Bankruptcy using the property collected by the Receiver ("the Corporate Compromise"). CR.162. The Trustee explained that an undetermined portion of the collected property could be avoidable transfers belonging to TaxMasters, Inc. and TMIRS and that "[t]his settlement resolves issues beyond the recovery of assets currently in possession of/under the control of the Receiver." CR.166-67. Consistent with Cox's then-existing personal liability, the Compromise Account would be used to pay the consumer complainants resulting from the judgment against Cox, TaxMasters, Inc., and TMIRS. CR.169-70, 173. The Receiver stated that "Mr. Cox had notice of this Compromise Agreement, an opportunity to be heard, and did not object to the relief granted by the court." CR.199. The bankruptcy court approved the Motion to Compromise. CR.177

**III. Cox Receives His Assets Back Through the Bankruptcy Process.**

### A. The appeals court reverses as to Cox's personal liability.

On July 1, 2014, the Seventh Court of Appeals[2] reversed the trial court's judgment as against Cox because Texas had not presented an adequate basis to pierce the corporate veil and hold him individually liable for his corporate misconduct. CR.97-111; *see generally Cox*, 448 S.W.3d 497. The Texas Supreme Court denied review on April 1, 2016. CR.246. Cox did not pursue any remedies on remand.

In May 2016, nearly two years after the Seventh Court's decision, Cox filed for voluntary chapter 11 personal bankruptcy. CR.182-94. In June 2016, the Receiver returned all of Cox's remaining assets in the Receiver's possession, including all of Cox's stocks and ownership interests in the Entities. CR.243-44. Cox nevertheless filed suit and applied for a temporary restraining order against the Receiver. CR.245-54. Specifically, Cox brought claims for restitution and fraudulent transfer, seeking return of the Receiver's fees and expenses. *Id.* The bankruptcy court dismissed Cox's claims against the Receiver on March 20, 2017. *In re Cox*, No. 16-32363-H5-11, 2017 WL 1058263, at *2 (Bankr. S.D. Tex. Mar. 20, 2017).

---

[2] The Texas Supreme Court transferred the case from the Third Court of Appeals under a docket equalization order. CR.97.

## B. Cox receives his assets back.

On June 26, 2017, Cox filed a Motion to Compromise based on a settlement between Cox and the Corporate Trustee ("the Personal Compromise"). CR.326-35. The settlement states that Cox "asserts a right to recover approximately $560,000 … paid to Trustee from the liquidation of personal and/or real property as part of" the Corporate Compromise. CR.336. The Corporate Trustee, meanwhile, had "filed a proof of claim in the amount of $9,000,000" against Cox's estate and related entities (including those party to this suit). *Id.* The settlement agrees to pay Cox $125,000 for Cox's lawyer fees and retain the remaining $435,206 to satisfy the $9,000,000 claim against Cox's estate:

> b. <u>Transfer of Funds</u>: From the Receiver Compromise Funds, Trustee shall transfer $125,000 to the PC Estate within twenty-one (21) days from the Effective Date. Such $125,000 funds shall be earmarked and under the terms of the Debtor's Modified Plan, as modified, be used solely to distribute to and pay allowed administrative claims held by Cox Debtor's general bankruptcy counsel, Baker & Associates, and special litigation counsel Wauson Probus in the Adversary Proceedings. Such funds shall be distributed to Baker & Associates and Wauson Probus upon the earlier of (a) confirmation of the Debtor's Modified Plan, or (b) approval of their fees and expenses by the Bankruptcy Court for the PC Estate. The remaining $435,206.86 of Receiver Compromise Funds shall be deemed paid by the PC Estate to Trustee and credited as partial satisfaction of Trustee's allowed $1 million general unsecured claim against the PC Estate.

CR.338.[3] Thus, the agreement would use the Account established in the Corporate Compromise to pay Cox's liabilities rather than the consumer complainants as originally intended. *Id.* The State objected on this ground. CR.358. On August 8, 2017,

---

[3] The Settlement Agreement states that it will reduce the $9 million claim to a $1 million claim in the preceding paragraph. CR.338.

the bankruptcy court approved the Personal Compromise over the State's objection. CR.362-63.

## IV. Cox Sues the State for $20 Million.

### A. Cox claims the state took and converted his property.

That brings us to the present suit. On April 3, 2018, Cox filed a complaint against the State seeking to recover "restitution" totaling over $20 million, which he alleges to be the value of the property collected by the Receiver. Complaint, *Cox v. State*, No. 18-CV-0409 (405th Dist. Ct., Galveston County, Tex. Apr. 3, 2018). It was then transferred to Travis County, where he amended his complaint twice, first on June 20, 2019, and later March 28, 2025. Cox's live pleading alleges two claims for violations of the Fifth and Fourteenth Amendments of the United States Constitution, two claims under the Texas Constitution (one alleging a taking under Article I, Section 17, and the other for violation of due course of law under Article I, Section 19), a claim for restitution, and a claim of civil conversion. CR.6-11.

The State filed a combined plea to the jurisdiction and motion for summary judgment arguing that Cox failed to plead or provide evidence showing these claims fell within an exception to sovereign immunity's general prohibition on money damages. CR.14-45, 49-56. The State further argued that Cox lacks standing and did not bring the claims within the respective statute of limitations. CR.45-49. Cox responded with a brief heavy on conclusory assertions, thin on authority, and free of specific

evidence. CR.525-49. He invoked cases about the rules between private parties, making no attempt to engage with the State's argument that he bears the burden to show how his claims overcome immunity. *See id.*

## B.  Cox misleads the district court about the facts.

The district held a hearing on the combined plea and motion for summary judgment. *See generally* RR.1-59. The State explained why Cox lost multiple times over—on sovereign immunity, standing, and the merits. RR.7-26. Rather than reach these issues, the district court locked in on one that Cox raised for the first time at the live hearing, unaccompanied by authority or evidence. Specifically, Cox argued that the injury came from the Corporate Compromise, and that it was improper to transfer the Receiver-collected funds to the corporate bankruptcy. RR.31-52.

The district court rejected Cox's theory, explaining that receivers act pursuant to court orders, and reiterated this multiple times. "[W]hen I appoint a receiver, that individual is not allowed to sell things, certainly not companies or property, without my approval. … They're also not allowed to disburse the proceeds they collect without my approval. The receiver, in my view, works for me." RR.32. "[A]ssuming he did not exceed the boundaries of the powers he was given by the judge who signed the appointment order, he is allowed to take every bit of non-exempt property." RR.34. The district court understood that Texas does not control the court-appointed receiver.

When the district court asked if Cox got the money back through bankruptcy, Cox led the court to believe otherwise:

11

> What I think you're telling me is that the receiver only acted against Mr. Cox's personal assets, not the two companies in bankruptcy. But that Mr. Cox was also in bankruptcy, and so, all the proceeds were sent to the bankruptcy judge for Mr. Cox's personal bankruptcy. So if that's not right, tell me what did happen.

RR.32-33. The district court seemed to correctly believe this would be dispositive. Cox said, "the answer is not quite." RR.33. Counsel did not explain (in this colloquy or later) that he got the money back through the Personal Compromise and the only difference between the proposed question and reality is one extra step.

When discussing why "the [Receiver] money was given to the trustee of the companies' bankruptcy," Cox explained "[t]hat was the settlement agreement." RR.42-43. The court responded "I think that's your answer. I think that's it. That's the end of the story. He agreed to it." RR.43. "He did not get the money back because he agreed to let the [trustee] of his companies take it." RR.44. (Note that the court proceeded on the view that Cox never received his money back.) The court explained that, if "all of his non-exempt assets …. were given to the Plaintiff in that case, the State of Texas, I would have said he gets them back. … But instead, Mr. Cox and the State of Texas, I assume, agreed to give all that money to the companies' bankruptcy. He doesn't get it back, then." RR.44.

Cox again misled the court to believe that he objected to the Corporate Compromise. Cox's counsel acknowledged "this was approved by a court" and "I'm sure he was given notice of it." RR.45, 47. The court responded, "Well, then he's involved. If he got notice in advance, he should have come to court and said, no, do not give my money to these companies that belong to me, because it's my money, not

their[s]." RR.47. Cox responded, "Well, and so the judge says, I'm going to give it anyway." RR.47. Understanding this answer to mean Cox objected, the court responded, "then maybe you have a different problem." RR.47. But the record unequivocally shows that Cox did not object to the Corporate Compromise. CR.199.

The State explained that this previously was not at issue. "The reason we did not get into this issue … is because we didn't expect this to be a point of contention." RR.53. Quoting the compromise motion, "the receiver stated the following: Mr. Cox had notice of this … compromise agreement and an opportunity to be heard and did not object to the relief granted by the court." RR.53. "In other words, … Mr. Cox had an ability to oppose when it happened and he didn't object to it. So it doesn't matter what else happened between the receiver and the trustee, because it wasn't Texas." RR.53.

The district court, proceeding on Cox's failure to correct the district court's misapprehension, pivoted course. It previously noted that "I don't have anything convincing in front of me that Texas made the decision to give the money to the company." RR.52. But then stated that Texas's liability "depends on if that agreement could have taken place without Texas or not," RR.53, and landed on "there's no way this money went anywhere without Texas saying so," RR.55. "[I]f the money went not to the creditor directly but somewhere else, I have to assume, without … some contradictory evidence, that the creditor made that decision." RR.57.

A few days later, the district court issued its order permitting Cox's state law claims to proceed. CR.822-23. The State timely filed a notice of appeal. CR.824-25.

# Summary of the Argument

Cox lacks standing because he was made whole. The Receiver returned his assets through the bankruptcy process, and the only losses—receiver fees and liquidation effects—were self-inflicted consequences of his failure to post a valid bond or object to court-approved actions. Standing cannot rest on self-inflicted injuries.

Even if standing existed, sovereign immunity independently requires dismissal. The Legislature has not waived immunity for conversion or restitution claims, and *Reata* abrogation does not apply to a new lawsuit filed years after the DTPA judgment and court of appeals decision. Retrospective monetary relief is barred regardless of how Cox labels it.

His constitutional claims are facially invalid. A due course of law claim cannot support damages against the State, and Cox received notice and a hearing at each stage, foreclosing any equitable relief. A takings claim requires an intentional appropriation of property for public use, but Texas never took or controlled Cox's assets—and the Receiver acted as an arm of the court.

That leaves the Court with an individual who agreed at every step and received his money back, suing the State for money it did not collect or receive. Because Cox shows no cognizable injury, identifies no waiver of immunity, and alleges no valid constitutional violation, the district court lacked jurisdiction. The district court, relying on Cox's misrepresentations, erred in permitting this case to proceed. This Court should reverse and render judgment dismissing the suit.

## STANDARD OF REVIEW

A plea questioning the trial court's jurisdiction raises a question of law, which is reviewed de novo. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007); *Eriksen v. Nelson*, 708 S.W.3d 302, 307–08 (Tex. App.—15th Dist. 2025, no pet.). For an evidentiary plea like this one, the standard of review "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). The plaintiff has the burden to adduce evidence to "raise a fact question on the jurisdictional issue." *Id.* The Court reviews the evidence in the light most favorable to the nonmovant to determine whether a genuine issue of material fact exists. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). "[T]o determine whether sovereign immunity has been waived, courts look to the substance of a plaintiff's claim, not the plaintiff's characterization of his claims." *Stringfellow v. Texas Dep't of Pub. Safety*, No. 15-24-00024-CV, 2025 WL 996361, at *3 (Tex. App.–15th Dist. Apr. 3, 2025, pet. denied) (mem. op.) (citing *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003)).

## ARGUMENT

### I. Cox Did Not Bring His Claims Within the Limitations Period.

Cox has the burden to prove he complied with all "statutory prerequisites to suit" because they "are jurisdictional requirements in all suits against a governmental entity." Tex. Gov't Code § 311.034; *see Tex. State Univ. v. Tanner*, 689 S.W.3d 292, 296 (Tex. 2024); *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 515 (Tex.

2012). For all property except the AOC ranch, the two-year limitation governing personal property applies. Tex. Civ. Prac. & Rem. Code § 16.003. Because Cox did not bring these claims within the two-year limitation, the district court erred by permitting them to proceed.

A two-year limitation applies for each claim insofar as it seeks damages for personal property. The Legislature requires that "a person must bring suit … for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another … not later than two years after the day the cause of action accrues." Tex. Civ. Prac. & Rem. Code § 16.003(a). Whereas courts used to be split on whether restitution fell under the two- or four-year limitation, the Texas Supreme Court "declare[d] categorically today what we have indicated twice previously: Unjust enrichment claims are governed by the two-year statute of limitations in section 16.003 of the Civil Practice and Remedies Code." *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 871 (Tex. 2007) (per curiam); *see Pollard v. Hanschen*, 315 S.W.3d 636, 641 (Tex. App.—Dallas 2010, no pet.) ("A two-year statute of limitations applies to conversion and restitution claims.").

Cox did not bring the personal property claims within the statutory limit. The record shows that, except for AOC ranch, the Receiver collected personal property. CR.225. The applicable date is July 1, 2014—the date of the Seventh Court's decision—as that is when Cox regained any claim to the property. Cox filed suit on April 14, 2018—well beyond the two-year limit. Even if the clock began to run on the date the Texas Supreme Court denied review (April 1, 2016), Cox still missed the deadline. CR.246. The district court erred by concluding otherwise.

Cox's authority is inapposite. The State raised the applicable limitations periods as a bar to Cox's claims in both its answer and combined plea and motion for summary judgment. CR.47-49. Cox claimed, in his response, that "Section 108(a) of the Bankruptcy Code extends the statute of limitations for at least two years from the filing" of his personal bankruptcy. CR.545-46. But that statute grants rights to the trustee, not Cox. *See* 11 U.S.C. § 108 (providing tolled limitations periods in which "the trustee may commence such action"); *see In re Topcor, Inc.*, 132 B.R. 119, 125–26 (Bankr. N.D. Tex. 1991) ("Section 108(a) sets forth the circumstances within which a trustee can bring an action which the debtor could have brought."). Cox cannot invoke a trustee's right to extend the limitations for a suit he filed.

The district court erred by permitting these claims to proceed.

## II. Cox Lacks Standing Because He Received His Assets Back.

Cox's substantive claims raise complex questions about the relationship between the State's immunity and the derivative judicial immunity extended to receivers and trustees. *Infra* Parts III & IV. But the Court need not reach them because Cox received most of his money back. *Infra* Section II.B. The only possible grievances, such as the harm from a liquidation (as opposed to a private sale) and the loss of Receiver fees, were self-inflicted: neither would have happened if he paid the supersedeas bond, or accepted the district court's offer to entertain a motion lowering it. *Infra* Section II.C. Cox's arguments to the district court about the Corporate Compromise were a red herring; putting aside that this was proper at the time due to the pierced veil, and Cox did not object to this, the compromise did not impose either the liquidation-devaluation or receivership expenses and fees he now seeks.

"Standing is a component of subject-matter jurisdiction." *State v. Nonparty Patient No. 1*, Nos. 15-25-00023-CV, 15-25-00039-CV, 2025 WL 2355380, at *4 (Tex. App.—15th Dist. Aug. 14, 2025, no pet. h.) (citing *Teal Trading & Dev., L.P. v. Champee Springs Ranches Prop. Owner's Ass'n*, 593 S.W.3d 324, 338 (Tex. 2020)). "To establish standing, a plaintiff must allege a 'concrete injury ... and a real controversy between the parties that will be resolved by the court.'" *Ramos v. Dunbar*, No. 15-24-00019-CV, 2025 WL 543113, at *4 (Tex. App. —15th Dist. Jan. 14, 2025, no pet.) (mem. op.) (quoting *Farmers Tex. Cnty. Mut. Ins. v. Beasley*, 598 S.W.3d 237, 240 (Tex. 2020)). Without an injury, there is no standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he irreducible constitutional minimum of standing" requires that "the plaintiff must have suffered an 'injury in fact.'").

### A. Cox fails to present evidence about harm to the entities.

As a preliminary note, the State cannot discern Cox's theory of injury to the entities. Cox lists his entities in the case caption but did not explain his theory of injury in the petition or at the hearing. Yet he claimed in his response brief that he has standing to assert injuries to the same. CR.543-44. Cox's failure to articulate a cogent theory or identify authority or evidence to support his claims falls short of his burden to allege standing and how these claims overcome sovereign immunity. *See Abbott v. Mexican Am. Legis. Caucus*, 647 S.W.3d 681, 693 (Tex. 2022) ("Without standing, the courts cannot proceed at all, and the party who invokes the courts' jurisdiction 'bears the burden of establishing these elements.'" (quoting *Lujan*, 504 U.S. at 561)). It also leaves the State with no recourse other than guesswork in formulating its response.

18

Cox asserts he has standing to assert claims for the entities because he "had a vested ownership interest in the entities since he owned the entities." CR.543. The Receiver did not sell Cox's equity in those entities but instead returned them once Cox began personal bankruptcy proceedings, CR.243-44; even if the Receiver did sell the interests, that would be a claim by Cox, not the entities. *See Mendell v. Scott*, No. 01-20-00578-CV, 2022 WL 2951666, at *5 (Tex. App.–Houston [1st Dist.] July 26, 2022, pet. denied) (explaining that "[a]n interest in stocks is personal property" and collecting sources).[4] Cox asserts without evidence that "[t]he Receiver did not return all of Cox's equity in the Entities to him." CR.544. The record refutes this. CR.243-44.

If Cox's position is that the property held by the entities should have been beyond the reach of the Receiver, that fails too. *Cf.* CR.543, 46 (Asserting that "Cox owned the entities" and "is pursuing these claims as the agent of these entities"). For example, the Receiver's documents show that he "exercise[d]... control over Defendant Cox's ownership interest in AOC Hunting, LLC" and sold the land owned by that entity "pursuant to Order of the Receivership Court, with notice to Mr. Cox, who did not oppose the sale." CR.222, 508. Cox does not explain why entities completely within his control were not properly subject to collection by the Receiver at the time. *Contra* CR.84 (receivership order granting this right). Stated

---

[4] The Receiver appeared to sell $496 of TMIRS property—which the Receiver remitted back to that entity. CR.227. TMIRS is not a party to this suit; in any event, the $496 conversion was not wrongful because TMIRS did not appeal the DTPA judgment.

another way, he either owned the property (making them eligible personal property) or he did not own them and cannot bring a claim on their behalf. As the district court in this case noted, if Cox believed it improper, he could have raised the issue prior to the Court's approval. RR.32,47. He did not. CR.222, 229.

Without development, the State cannot respond further. The State accordingly will focus on Cox's claims brought "for himself" for the remainder of the brief.

## B. Cox was made whole.

Cox lacks standing to challenge the Receiver's collection because he received the same funds back, which were more than his self-identified net worth. The Receiver collected $830,756. CR.225. It immediately returned $50,816 to Cox and $496 to TMIRS. CR.227. On July 1, 2014, the Seventh Court reversed as to Cox's personal liability. CR.111-12. In June 2016, the Receiver returned all of Cox's remaining assets in the Receiver's possession, including all of Cox's stocks and ownership interests in the Entities. CR.243-44. On August 1, 2017, Cox invoked the reversal of the State's judgment as support for the personal compromise in bankruptcy proceedings. CR.328, 336. The Corporate Trustee then paid $125,000 to Cox's lawyers and retained $435,206 to settle the $9,000,000 in proven claims against him. CR.338; *see* CR.349 (entering a "take nothing" judgment in the Corporate Trustee suit against Cox due to Personal Compromise). Thus, of the $830,756, Cox received $611,518. That leaves $219,238—the exact amount paid to the Receiver for expenses and fees. CR.227, 248. Cox consciously omits all of this.

Cox lacks standing because he was made whole. Cox filed an affidavit with the District Court clerk stating his net worth before collection is $548,418.29 *including*

20

exempt personal property (and $440,262.28 without). CR.117. The Receiver did not collect any exempt property. CR.196-99. As an initial matter, his previous declaration of net worth precludes his claim of $20,000,000 damages to his net worth. Instead, by Cox's own representations, the $611,518 that he received directly or through the Personal Compromise makes him more than whole. As explained below, the receiver fees were self-inflicted. Even if that were not the case, he received back more than his self-identified net worth without a return of the fees.

## C. Any purported harms were self-inflicted.

Cox's only conceivable claims—devaluation by court-ordered sale and the receiver fees and expenses—were self-inflicted, and "standing cannot be conferred by a self-inflicted injury." *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018); *accord Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 937 F.3d 533, 541 (5th Cir. 2019) (same); *see Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (same); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (holding litigants "cannot manufacture standing merely by inflicting harm on themselves").

Cox lacks standing for his self-inflicted harms in three ways. First, he inflicted this harm on himself by failing to post a bond. Second, to the extent any injury came from the Corporate Compromise, he inflicted that on himself by not asserting his rights. Third, he fails to explain how the same harms would not have been inflicted by his own personal bankruptcy.

### 1. Cox did not post a supersedeas bond despite Court warnings.

Cox failed to post a bond or seek a lower one despite court warnings that "collection efforts would ensue." CR.131. The court admonished that Cox "has known

21

since last November of my order setting the amount for a supersedeas" and "has known that he has not provided security in that amount" and thus "should have expected that collection efforts would ensue." *Id.* The court continued: "Mr. Cox must have known for some time of his alleged decrease in net worth, yet he did not act" and offered that "if Mr. Cox wishes to pursue a motion to set a lower amount for the supersedeas, my office will provide a setting" but "setting such a motion is not an emergency other than one of Mr. Cox's *own making.*" *Id.* (emphasis added). Cox did not accept the court's offer but instead filed both an emergency petition and a mandamus, both of which were denied. *See Cox*, 2013 WL 609243, at *1; *In re Cox*, 2013 WL 692435, at *1.

Once he failed to post bond, the district court did not have discretion to stay collection. The Texas Supreme Court consistently holds as much. *See, e.g.*, *In re Sheshtawy*, 154 S.W.3d 114, 118 (Tex. 2004) (holding that "when a final judgment is not superseded," even if "'that the judgment ha[s] been appealed' … '[a] trial court has an affirmative duty to enforce its judgment.'" (quoting *In re Crow–Billingsley Air Park, Ltd.*, 98 S.W.3d 178, 179 (Tex. 2003))); *accord In re Texas Educ. Agency*, 619 S.W.3d 679, 683 n.18 (Tex. 2021). Cox asserts that "[t]he State could have in-structed the Receiver to wait until the appeal had concluded. The State elected not to wait for the appeal process but elected to have the Receiver go after Cox." CR.547. But Cox acknowledges that the State "had the legal ability to enforce the Judgment when it did[.]" CR.8. And he overlooks that a Receiver is acting as an arm of the court. *Infra* Section IV.A Once he failed to post bond, the State had the right to collect, and the Receiver had a duty to do the same.

22

### 2. Cox did not object to the Receiver's actions.

Compounding his failure to protect his own interests is the fact that he did not oppose the Receiver's motion to sell. *See* CR.222 (Receiver inventory noting that it sold the AOC Ranch "pursuant to Order of the Receivership Court, with notice to Mr. Cox, who did not oppose the sale"); CR.229 (order approving Receiver's sale of real property and noting that "Defendant Patrick Cox is unopposed").

His devaluation claim is also rebutted by record evidence. He argues that "[b]ecause the Receiver's sale of Cox's property was at forced sale, the property sold at a fraction of the price it would have brought at a private sale." CR.526. That is wrong for multiple reasons. First, the district court's Order Granting Turnover and Appointing Receiver explicitly required "private sale" of the assets for "a fair and reasonable value." CR.88. And the record shows the Receiver actively negotiated to maximize value. *See, e.g.*, CR.484. This was not an "everything-must-go" public auction as Cox implies—even though the Receiver was permitted to do that, too. CR.280. Second, if Cox believed any given sale did not meet this standard, he should have objected to the Receiver's motion to sell—but did not. *See* CR.222, 229. Third, the evidence shows the Receiver got more value than Cox identified. *See* CR.484 (explaining Cox valued the real property at $462,050 which the Receiver sold for $850,000). This argument fails under the slightest scrutiny.

His claim for receiver fees similarly fails because the Receiver is statutorily authorized to be paid for its services. The district court appointed the Receiver after a hearing on the matter. CR.81-94. After Cox failed to produce a bond, the Receiver was legally obligated to enforce the judgment according to the district court's order.

*Supra* Section II.C.1. And once that happened, the Receiver is statutorily entitled to fees. *See* Tex. Civ. Prac. & Rem. Code § 34.047(b) ("The officer is entitled to retain from the proceeds of a sale of personal property an amount equal to the reasonable expenses incurred by him in making the levy and keeping the property.").

Cox knew he would be liable for fees absent a proper bond. The district court's order explicitly states that expenses "shall be taxed as costs against Defendant." CR.86, and the Receiver is entitled to a fee of 25% of net proceeds. CR.93. Even the Corporate Compromise acknowledges that, were the Corporate Trustee to succeed on its avoidable transfer claims, the Receiver would have a claim to keep its fees. CR.166-67. Multiple steps stand between the fees that Cox claims and the State's actions. *See Green v. Tex. Comptroller of Pub. Accts.*, 697 S.W.3d 305, 311 (Tex. App.—El Paso 2023, pet. reh'g filed) ("Standing 'is ordinarily substantially more difficult to establish' when 'a causal relation between injury and challenged action depends upon the decision of an independent third party.'" (quoting *Daves v. Dallas County, Tex.*, 22 F.4th 522, 543 (5th Cir. 2022) (en banc))). Cox cannot now claim that the State must make him whole for his self-inflicted harms.

### 3. Cox fails to explain how the Trustee for his personal bankruptcy would not have done the same.

If the Receiver did not collect against Cox, the Trustee in his personal bankruptcy would have done the same thing of which he now complains: collect his assets, sell them (under the same "forced sale" logic), and collect the fees incurred. *See* CR.296 (Cox's personal bankruptcy plan estimating $150,000 in fees without collection). After the Seventh Court reversed, Cox did not seek to recuperate his assets on

remand but instead filed a personal bankruptcy action. CR.182-94. Cox neither claims nor provides evidence that his personal bankruptcy was the result of the DTPA judgment. Indeed, he did not declare personal bankruptcy until May 2016, two years after the Seventh Court reversed the judgment against him in July 2014. *Id.* The record appears to indicate that his net worth was tied up in the value of the companies, which went to nearly zero after the DTPA judgment (later upheld by the Seventh Court). *Id.*

The Texas Supreme Court provides that "[a] new and independent cause" severs the link between a defendant's actions and a claimant's harms because it "alters the natural sequence of events, produces results that would not otherwise have occurred, is an act or omission not brought into operation by the original wrongful act of the defendant, and operates entirely independently of the defendant's allegedly negligent act or omission." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 857 (Tex. 2009); *see City of Baytown v. Schrock*, 645 S.W.3d 174, 186 (Tex. 2022) (Young, J., concurring) (analyzing this in the takings context). Cox fails to explain how his claim for devaluation and receiver fees survives this independent, intervening decision that would have caused the same harm.

That leaves the Court with an individual who agreed at every step and received his money back, suing the State for money it did not collect or receive. This Court need not reach the more complex immunity questions on these facts because Cox lacks standing.

25

## III. Sovereign Immunity Categorically Bars Cox's Conversion, Restitution, and Due Course of Law Claims.

If the Court finds the devaluation and receivership fees to be cognizable injury, it must proceed to the next step: whether these are claims properly made against the State. "Texas has long recognized that sovereign immunity protects the State of Texas against lawsuits for damages unless the State consents to be sued." *Gulf Coast Ctr. v. Curry*, 658 S.W.3d 281, 283 (Tex. 2022). "In a suit against a governmental unit, the plaintiff must affirmatively demonstrate the court's jurisdiction by establishing a valid waiver of immunity." *Id.* at 284 (citing *Swanson*, 590 S.W.3d at 550). "[A]bsent the state's consent to suit, a trial court lacks subject matter jurisdiction." *Tex. DOT v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999).

The district court permitted four causes of action to proceed: (1) conversion; (2) restitution; (3) due course of Law under Texas Const. art. I, sec. 19; and (4) taking under Texas Const. art. I, sec. 17. A claim for money damages for the first three do not fall under any exception to sovereign immunity and must be dismissed.

### A. The Legislature retains immunity for conversion claims.

The live pleading states that "Cox asserts claims for civil conversion. Cox's property was taken over ten (10) years ago by the receiver acting for the State of Texas and only a small part has been returned." CR.10. The only specific assertion regarding conversion, found in Cox's Response to the State's Combined Plea and Motion, states that "[t]he State has converted the $219,733 [sic] and is liable for civil conversion by refusing to return such funds." CR.534. This amount refers to the fees

paid to the Receiver for execution of the DTPA judgment. CR.526-27, 547. [5] The State explained that a claim for conversion does not fall within the Tort Claims Act's limited waiver, CR.41-42, and that Cox did not address this point in his response, CR.811-12. Although Cox did not address it at the hearing, either, the district court nevertheless denied the State's jurisdictional plea on that claim. CR.822.

This Court recently explained that conversion claims are intentional torts beyond the Tort Claims Act's waiver. *See Curadev Pharma Pvt. Ltd. v. Univ. of Tex. Sw. Med. Ctr.*, No. 15-25-0004-CV, 2025 WL 2414661, at *6 (Tex. App.—15th Dist. Aug. 21, 2025, no pet. h.). "Tort claims against a governmental entity are governed by the Texas Tort Claims Act." *Id.* (citing Tex. Civ. Prac. & Rem. Code § 101.106). "The [Act] … does not waive immunity for claims arising out of intentional torts." *Id.* (citing Tex. Civ. Prac. & Rem. Code § 101.057). "Intentional conduct, no matter how it is pleaded, falls under the [Act]'s sovereign immunity waiver exception." *Id.* (quoting *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001)). Because conversion is an intentional tort, "the Tort Claims Act does not waive Appellees' sovereign immunity from suit for … conversion." *Id.* at *7.

This Court must dismiss the conversion claim for lack of jurisdiction.

## B. Restitution is retrospective monetary damages.

Cox claims he "is owed over $20,000,000 in restitution from the State … which represents the damages that he incurred as a result of the State's enforcement of the Judgment[.]" CR.6. He invokes the "[r]estitution after reversal" rule that is well-

---

[5] The record indicates that the Receiver kept $186,736 in fees and $32,502 in expenses, adding up to $219,238. CR.227.

established between private parties. *See, e.g.*, *Miga v. Jensen*, 299 S.W.3d 98, 101 (Tex. 2009). But the State is not a private party, and "[r]etrospective monetary claims, even by way of mandamus or declaratory relief, are generally barred by immunity, absent legislative consent." *In re Nestle USA, Inc.*, 359 S.W.3d 207, 212 (Tex. 2012) (orig. proceeding); *accord City of El Paso v. Heinrich*, 284 S.W.3d 366, 374 (Tex. 2009). Cox accordingly must identify where the Legislature consented to suit and liability for his restitution claim. This he cannot do.

Cox seeks retrospective monetary relief. Indeed, he does not attempt to hide this point. *See, e.g.*, CR.11 (seeking restitution for "actual damages" and "losses incurred by him"). The Texas Supreme Court recently held that "[w]hether the claim is one for actual damages in a common-law suit or a statutory claim for 'restitution', both claims seek retrospective monetary relief against the government. Immunity bars them both." *Chambers-Liberty Cntys. Navigation Dist. v. Texas*, 575 S.W.3d 339, 347 (Tex. 2019) (orig. proceeding); *see also Denver City Indep. Sch. Dist. v. Moses*, 51 S.W.3d 386, 391–92 (Tex. App.–Amarillo 2001, no pet.) ("Award of restitution is an award of 'damages.'"). As explained below, *infra* Section III.C, Cox would have needed to bring these claims within the original suit; sovereign immunity protects the State from his decision to instead bring a new suit for retrospective monetary relief.

### C. *Reata* abrogation does not apply where Cox initiated suit.

Cox argues that "sovereign immunity does not bar Cox from pursuing his claims against the State because the State waived its immunity by suing Cox to obtain the Reversed Judgment in the first place." CR.538; *see id.* ("[T]he State may waive its

28

sovereign immunity by choosing to engage in litigation to assert affirmative claims for money damages against a party." (citing *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375-76 (Tex. 2006)). This allegedly applies here because "Cox's claims would not even exist but for the fact that the State brought affirmative claims for monetary damages against him." CR.539. Cox misreads *Reata*'s import.

In *Reata*, a contractor sued a subcontractor, alleging that the subcontractor negligently drilled into a main water line. *See* 197 S.W.3d at 373. After the subcontractor filed a third-party claim against the City of Dallas, the City intervened and "assert[ed] claims of negligence against [the subcontractor] *and* a plea to the jurisdiction asserting governmental immunity from suit." *Id.* (emphasis added). The Texas Supreme Court, rejecting the City's plea, explained that "where the governmental entity has joined into the litigation process by asserting its own affirmative claims for monetary relief," sovereign immunity does not prevent "adverse parties [from] assert[ing], as an offset, claims germane to, connected with, and properly defensive to those asserted by the governmental entity." *Id.* at 376-77.

The Texas Supreme Court clarified *Reata*'s scope in *Nazari v. Texas*, 561 S.W.3d 495 (Tex. 2018). There, the State sued a group of dentists under the Texas Medicaid Fraud Prevention Act (TMFPA). *Nazari*, 561 S.W.3d at 497. The dentists "assert[ed] counterclaims … alleging that the state and its contractor mismanaged the payment-approval process and misled the Providers regarding the [applicable] requirements." *Id.* The question was whether *Reata* abrogation applied to the dentists' claims. *See id.* at 502-10. The Texas Supreme Court explained that, in *Reata*, "the City sought to recover for the subcontractor's negligence, and at the same time

29

maintained that it was immune from answering for its own negligence." *Id.* at 505 (citing 197 S.W.3d at 373). It then described *Reata*'s logic:

> Once a "governmental entity interjects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs." [And] "it would be fundamentally unfair to allow a governmental entity to assert affirmative claims against a party while claiming it had immunity as to the party's claims against it."

*Id.* at 502 (internal citations omitted). Rejecting the dentists' right to bring counterclaims, the Court explained that "the state's assertion of a claim for monetary relief, standing by itself, is not enough to trigger *Reata*'s abrogation-of-immunity rule" because "money is at issue in many more of the state's actions than those in which it seeks damages." *Id.* at 507. Because the State was seeking penalties under a public welfare statute, and not money damages, the Court concluded that *Reata* abrogation did not apply. *Id.*

*Reata*'s "abrogation-of-immunity rule" does not apply because Texas did not initiate this suit. Both *Reata* and *Naziri* examine the circumstances in which a state's affirmative litigation removes immunity protections. *See id.* Whereas the State waives immunity by voluntarily entering a suit for damages, it retains that immunity when initiating a public welfare suit for penalties. *Id.* at 506. While the State's affirmative litigation in *Nazari* did *not* waive immunity, the necessary premise in either situation is that the state voluntarily entered the suit. That is not the case here.

Even if *Reata* applied here, Cox would have needed to seek relief on remand in the DTPA suit. Cox argues that "the State waived its immunity by suing Cox … in

the first place." CR.538. That argument, if correct, would have been appropriate to raise on remand after the Seventh Court reversed. Cox instead filed this new suit for restitution. That distinction matters. If a court were to expand *Reata* abrogation to "the right to bring any suit, in any jurisdiction, asserting any claim, so long as the State filed a suit in the past," the exception would swallow the rule.

### D. Cox cannot seek damages for his Due Course of Law claim.

Cox's due process claim, analyzed under the Texas Constitution's due course of law clause, fails because sovereign immunity bars a suit for damages, and he does not seek proper equitable relief. His claim is facially invalid, in any event, because he received the safeguard of judicial proceedings at every step and admits to receiving notice of the same.

The Texas Constitution's due-course-of-law guarantee provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. The same analysis guiding the federal due process clause applies here. *See Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*, 712 S.W.3d 943, 955 (Tex. App.—15th Dist. 2025, no pet.). Due process challenges typically examine whether some non-judicial body afforded adequate protections in relation to the interest at stake. *See, e.g.*, *Young v. Tex. Parks & Wildlife Dep't*, 2025 WL 1200947, at *1 (Tex. App.—15th Dist. Apr. 24, 2025, no pet. h.) (mem. op.) (reviewing a "breeder deer depopulation notice issued by the Texas Parks and Wildlife Department"); *AFLOA, LLC v. Tex. Dep't of Motor Vehicles*, 2025 WL 209447, at *1 (Tex. App.—15th Dist. Jan. 16, 2025, no pet.) (mem. op.) (examining a DMV order

revoking a vehicle-dealer license). Where a valid judicial proceeding is the source of deprivation, the question is whether the individual received notice and a meaningful opportunity to be heard. *See B. Gregg Price, P.C. v. Series 1 - Virage Master LP*, 661 S.W.3d 419, 422-23 (Tex. 2023) (per curiam).

### 1. The only remedy is prospective relief, which Cox does not seek.

Cox cannot seek damages for his due course of caw claim. "Even though Texas law does not shield State officials from equitable relief for violating a citizen's constitutional rights, a suit for damages for violating a citizen's constitutional violations is not allowed, except for takings claims." *City of Port Arthur v. Thomas*, 659 S.W.3d 96, 116 (Tex. App.—Beaumont 2022, no pet.) (citing *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995)). The Texas Supreme Court explained that the remedy for violations of the Texas Constitution is to seek a declaration that the law or act is void and that "[s]uch a declaration is different from seeking compensation for damages, or compensation in money for a loss or injury." *Bouillion*, 896 S.W.2d at 149. Whereas "suits for equitable remedies for violation of constitutional rights are not prohibited," there is no "private right of action for damages … implied under the Texas Constitution." *Id.*

Cox does not seek proper equitable relief. Although "restitution" is equitable in nature, it does not overcome sovereign immunity when brought as a vehicle to seek "retrospective monetary relief against the government." *Chambers-Liberty Cntys. Navigation Dist.*, 575 S.W.3d at 347; *see Poole v. W. Hardin Cnty. Consol. Indep. Sch. Dist.*, 385 S.W.3d 52, 59 (Tex. App.—Beaumont 2011), *rev'd on other grounds*, 384 S.W.3d 816 (Tex. 2012) ("Because Poole seeks monetary, non-equitable relief, his

pleadings affirmatively negate the existence of jurisdiction over his due course of law claim."); *supra* Section II.B. That is what Cox seeks. *See* CR.11 (asking "the Court award him judgment against the State of Texas for … restitution for claims for violation of Cox's right to due process"). The available remedy would instead be prospective relief. *See Tex. DOT v. Sefzik,* 355 S.W.3d 618, 621 (Tex. 2011) (per curiam) (suits to require state officials to comply with constitutional provisions are not prohibited by sovereign immunity); *see also Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015). Yet even if Cox sought proper relief, he fails to establish a facially valid claim.

### 2. Cox's Due Course of Law claim also fails on the merits.

Cox's due course of law claim fails because each action Cox identifies fell within a full-fledged judicial proceeding of which he had notice. Due process challenges typically examine whether some non-judicial body afforded adequate protections in relation to the interest at stake. *See, e.g.*, *Young*, 2025 WL 1200947, at *1; *AFLOA, LLC*, 2025 WL 209447, at *1. Where a judicial proceeding is the source of deprivation, then, the only question is whether the individual received notice and a meaningful opportunity to be heard. *See B. Gregg Price, P.C.*, 661 S.W.3d at 422-23.

The record reflects that Cox had notice regarding each step underlying his complaint. *See* CR.80 (notice of DTPA judgment); CR.131 (notice of insufficient bond); CR.197 (notice and challenging Receiver appointment); CR.217 (receivership court adding further notice requirements); CR.222 (notice of real property sale); CR.199 (notice of Corporate Compromise); RR.47 (same); CR.112 (notice of Seventh

Court's decision). That Cox chose not to properly assert his rights, to the extent he asserted them at all, does not create a constitutional harm.

Cox's contrary arguments lack merit. He twice asserts that "[w]hen the Seventh Court of Appeals reversed the judgment against Cox, it invalidated the process by which the State took Cox's property to satisfy the judgment. The State's continued refusal to refund the property taken from Cox is, therefore, unsupported by any valid process." CR.10; CR.534. A challenge to the validity of a judicial proceeding, as opposed to notice and opportunity to be heard, requires much more. *See, e.g.*, *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016) (finding a due process violation where a justice declined to recuse despite formerly prosecuting the defendant for the crime at issue); *accord Ex parte Halprin*, 708 S.W.3d 1, 3 (Tex. Crim. App. 2024) ("Due process guarantees 'an absence of actual bias' on the part of a judge."). Under Cox's theory, a due process claim would arise anytime an appellate court reversed a trial court decision. That cannot be right.

Cox's response brief relies on the purportedly "similar situation" addressed by the United States Supreme Court in *Nelson v. Colorado*, 581 U.S. 128 (2017). CR.534-36. There, the Supreme Court examined a Colorado statute that "retain[ed] conviction-related assessments unless and until" a criminal defendant who prevailed on appeal "institutes a discrete civil proceeding and proves her innocence by clear and convincing evidence." *Nelson*, 581 U.S. at 130. The Supreme Court held that the law violated the Fourteenth Amendment's guarantee of due process because "Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions." *Id.* at 136 (emphasis in original).

This analogy only goes as far as the fact that Cox had a judgment reversed on appeal. The State does not claim "that it can keep the amounts exacted so long as it prevailed in the court of first instance," and Cox is not "saddled with any proof burden" the way the prevailing defendants were in *Nelson*. *Id.* at 136-37. Instead, the State asserts that Cox cannot bring a new suit, beyond the limitations period, seeking retrospective monetary damages related to property it did not take or receive. *Nelson* says nothing to the contrary.

If Cox's claim is that he lacked any process to retrieve his funds after the Seventh Court's reversal, the record rejects that, too. He knew his assets had been liquidated and transferred to the Corporate Trustee as part of the Corporate Compromise. CR.326-35. After reversal, he went to the bankruptcy court that oversaw that process and received his money back. CR.338, 362-63. And if there were to be a claim against Texas, he could have raised it on remand but, again, chose not to. *Supra* Section III.D. His decision to not engage the processes available to him does not negate their existence. The district court erred in permitting this claim to proceed. *See Young*, 2025 WL 1200947, at *7 (holding that dismissal was appropriate where plaintiff "affirmatively demonstrate[d] incurable defects in jurisdiction").

In sum, Cox cannot point to any express waiver of Texas's sovereign immunity from claims for conversion or restitution, *Reata* abrogation does not apply to a claim brought in a new lawsuit, and he cannot seek damages for his due course of law claim. The district court accordingly lacked jurisdiction.

35

## IV. Cox's Takings Claim is Facially Invalid.

Cox's remaining claim is brought under the Texas Constitution's takings clause. CR.9, 11, 822. "The Texas Constitution waives sovereign immunity with respect to inverse-condemnation claims." *Curadev Pharma Pvt. Ltd.*, 2025 WL 2414661, at *4 (quoting *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014)). But "immunity from suit is not waived if the constitutional claims are facially invalid." *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015) (citing *Andrade v. NAACP of Austin,* 345 S.W.3d 1, 11 (Tex. 2011)). Because the record establishes that no takings violation occurred, the district court erred by permitting this claim to proceed.

### A. Texas neither took nor received any assets.

Cox's taking claim suffers numerous pitfalls, chief among them that Texas never possessed the assets for which he now seeks compensatory damages. Instead, it was the Receiver, who was acting as an arm of the judiciary while entitled to judicial immunity. The State's role in consenting to the Corporate Compromise is not sufficient to establish takings liability, as the State was acting within its legal rights. If this Court were to continue following Cox's tenuous theory of liability, it would have to reach the novel conclusion that these facts constitute a taking "for public use."

This Court's recent decision again guides this analysis. *See Curadev Pharma Pvt. Ltd.*, 2025 WL 2414661, at *4. "The Texas Constitution's takings clause provides that '[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person.'" *Id.* (quoting Tex. Const. art. I, § 17(a)). State action can constitute a taking

36

when it: 1) initiates a formal condemnation proceeding 2) "physically appropriate[s] or invade[s] property;" or 3) "regulate[s] property so restrictively or intrude on property rights so extensively that it effectively takes the property." *Id.* Cox must show: "(1) an intentional act by a governmental entity, (2) that resulted in a taking of property, (3) for public use." *Id.* (citations omitted).

Cox does not identify a taking because Texas never took or received anything. The Receiver, acting pursuant to a valid court order, collected and sold Cox's assets as a means of enforcing the judgment. CR.81-94. Following the Receiver's collection on the DTPA judgment, Texas consented to the Corporate Compromise, which transferred the Receiver-collected assets to the Corporate Trustee. CR.162, 177. While this fact seemed to give the district court pause, it overlooks that Cox did not object to this transfer. CR.199. The district court also acknowledged that receivers cannot act without court approval, RR.32, but then appeared to adopt the theory that the Receiver was acting at Texas's behest when transferring the assets as part of the Corporate Compromise. RR.55-57.

Cox's argument that Texas controlled the Receiver defies both well-established law and the record. Cox states, without authority or evidence, that "[t]here is no showing that the actions of the Receiver were not directed by the State. To the contrary, the State gave directions to the Receiver to sell Cox's assets and the assets of his entities." CR.544; *but see* RR.52 (The district court stating that "I don't have anything convincing in front of me that Texas made the decision to give the money to the company"). Yet the law provides that receivers are "[s]ubject to the control of the court." Tex. Civ. Prac. & Rem. Code § 64.031. Courts thus consistently hold

37

that "a receiver is an officer of the court." *Ex parte Griffitts*, 711 S.W.2d 225, 227 (Tex. 1986); *see Ex parte Hodges*, 625 S.W.2d 304, 306 (Tex. 1981) ("A receiver has only that authority conferred by the Court's order appointing him."); *1st & Trinity Super Majority, LLC v. Milligan*, 657 S.W.3d 349, 366 (Tex. App.—El Paso 2022) ("Certain court-appointees, including court-appointed receivers who act as agents of the court, are generally entitled to quasi-judicial immunity."); *cf. Clements v. Barnes*, 834 S.W.2d 45, 46 (Tex. 1992) (per curiam) ("[B]ecause bankruptcy trustees are 'arm[s] of the [c]ourt,' they are immune from liability for actions grounded in their conduct as trustee."). Cox identifies no contrary authority.

The record evidence confirms that the State did not have control of the Receiver or the funds. For example, the Receiver had permission from the court to intervene in other suits to which the State was not a party. CR.91. He in fact, exercised this authority. *See* CR.222 (noting the Receiver intervened in two separate insurance actions). And once the State consented to the Corporate Compromise, it did not control funds, as demonstrated by the Corporate Trustee's decision to transfer funds back to Cox *over the States's objections*. CR.358, 362-63.

## B. The record negates any claim of intent.

Even under Cox's novel theory, the State was acting in accordance with its rights. If this Court indulges the "taken-by-Receiver-but-consented-to-by-Texas" theory, it would not satisfy the "intentional" conduct requirement. The Texas Supreme Court explains that "[t]he State, in acting within a color of right to take or withhold property in a contractual situation, is acting akin to a private citizen and not under any sovereign powers." *Holland*, 221 S.W.3d at 643; *accord Curadev Pharma*

38

*Pvt. Ltd.*, 2025 WL 2414661, at \*5. In this context, the State "lacks the necessary intent to take under its eminent-domain powers and thus retains its immunity from suit." *Holland*, 221 S.W.3d at 643. Unlike a situation where "the State was exercising its eminent domain powers and did so mistakenly," the State "was not acting under its eminent domain power at all." *Curadev Pharma Pvt. Ltd.*, 2025 WL 2414661, at \*6. Rather, it held a valid judgment, which it could enforce or convey; stated another way, "[i]t was acting pursuant to … and within" its legal rights. *Id.*

Finally, Cox would have to show that the taking was for public use. *See Curadev Pharma Pvt. Ltd.*, 2025 WL 2414661, at \*9. Whether that applies when the State is enforcing a judgment, nonetheless one related to a public-welfare statute, appears to be a question of first impression. On one hand, the judgment might qualify for public use under the Texas Supreme Court's penalties analysis. *See Nazari*, 561 S.W.3d at 508 ("Many state programs and offices … depend at least in part for their continued existence on collecting revenue in the form of penalties."); *id.* at 510 (holding that because "the state seeks to impose a monetary penalty to enforce a substantive prohibition against unlawful conduct … the state's action is punitive rather than compensatory"). On the other hand, the DTPA judgment here included restitution to defrauded individuals. CR.67-68, 358. It is not clear that the State would be taking for public use when it collects on the restitution aspect of the judgment, as those funds would be conveyed back to private individuals. *Nazari* does not answer this question, as the Texas Supreme Court concluded that the TMFPA employed a penalty scheme. *See* 561 S.W.3d at 509.

The Texas Supreme Court directs the analysis back to mens rea. *See, e.g.*, *Holland*, 221 S.W.3d at 643 (holding that "the proper focus is whether the State had the requisite intent to take property for public use and thus was invoking its eminent-domain powers"). In *City of Dallas v. Jennings*, the Court rejected the "contention that any intentional act can give rise to liability for an intentional taking" because "[s]uch a standard would hold the government entity 'to a higher liability than a private person engaging in the same acts.'" 142 S.W.3d 310, 313 (Tex. 2004) (quoting *Houston v. Renault, Inc.,* 431 S.W.2d 322, 325 (Tex. 1968)). The Court explained that "[s]uch a requirement would also ignore the predicate of Article I, Section 17: that the damage be 'for or applied to public use.'" *Id.* Under that approach, Cox fails to show that the State's decision to consent to the compromise agreement meets this public-use standard. *See Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 802 (Tex. 2016) ("[T]he public-use element … was not established merely by the [Government's] approval of private development on other properties.").

Because Cox cannot identify evidence supporting a takings claim, it is facially invalid and the district court lacked jurisdiction to proceed. *See Mexican Am. Legis. Caucus*, 647 S.W.3d at 699.

## Prayer

This Court should reverse the district court order denying the State's plea to the jurisdiction and render judgment dismissing the suit.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

WILLIAM R. PETERSON
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

/s/ Jacob C. Beach
JACOB C. BEACH
Assistant Solicitor General
State Bar No. 24116083
Jacob.Beach@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-6407
Fax: (512) 474-2697

ALI THORBURN
Assistant Attorney General

Counsel for Appellant

## Certificate of Compliance

Microsoft Word reports that this brief contains 10,410 words, excluding exempted text.

/s/ Jacob C. Beach
NAME

41

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Amanda Ruch on behalf of Jacob Beach
Bar No. 24116083
amanda.ruch@oag.texas.gov
Envelope ID: 104941529
Filing Code Description: Other Brief
Filing Description: Cox_BoM_Final
Status as of 8/28/2025 6:53 AM CST

Associated Case Party: Patrick Cox

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Reese Baker | 1587700 | courtdocs@bakerassociates.net | 8/27/2025 5:34:54 PM | SENT |

Associated Case Party: The State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ali Thorburn | | ali.thorburn@oag.texas.gov | 8/27/2025 5:34:54 PM | SENT |
| Jacob Beach | | jacob.beach@oag.texas.gov | 8/27/2025 5:34:54 PM | SENT |
| Amanda Ruch | | amanda.ruch@oag.texas.gov | 8/27/2025 5:34:54 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ariana Ines | | ariana.ines@oag.texas.gov | 8/27/2025 5:34:54 PM | SENT |